## ALFRED ROONEY vs. RANDALL WEEKS & others.

Suffolk.    March 5, 1934. — February 27, 1935.

Present: RUGG, C.J., CROSBY, PIERCE, & LUMMUS, JJ.

*Equity Jurisdiction*, Retention for assessment of damages. *Contract*, Of employment, What constitutes, Construction, Performance and breach. *Damages*, For breach of contract. *Proximate Cause.*

A court of equity properly took jurisdiction of a suit, commenced at a time when a contract for personal service between the plaintiff and the defendant was in force, to enjoin the defendant from violating a provision thereof that he should not work for others during its term; and, where its term expired before the suit was ripe for final decree, it was proper for the court to retain jurisdiction for the assessment of the plaintiff's damages under a suitable prayer in the bill.

A contract for personal service, which provided that the employer should pay the employee specified sums "for the satisfactory performance of his duties," did not mean that the services were to be performed to the personal satisfaction of the employer and did not give him the right to discharge the employee unreasonably without incurring liability to him in damages, but gave the employer only the right to discharge the employee if, as a reasonable man, the employer should be dissatisfied with the services rendered; it could not properly be said that the contract was void for want of mutuality in that it gave the employer "the right to discharge" the employee "without recourse by declaring such services unsatisfactory."

The proper construction of a contract, in which the proprietor of a business of advertising by means of radio broadcasts hired one to work as a musical director and vocalist in connection with such broadcasts and it was provided that the employer should pay the employee $75 "per week for two programs or less per week" and $25 "for each additional broadcast per week," was that it unconditionally required the employer to pay the employee at least $75 per week during its term; and it could not properly be said that the contract was void for want of mutuality in that it did not unconditionally bind the employer to pay the employee anything.

It was not to be implied from the terms of a contract, whereby one was hired as a musical director and vocalist in connection with radio broadcasts, that the employer was required to use the employee and keep him at work during the term of the contract; and, in the absence of any usage or custom importing such an implied provision, the employer, who paid the employee or stood ready to pay him all sums due him under the contract, did not break it by not keeping him at work during a portion of the term.

In a suit in equity, commenced during the term of a contract for personal service between the plaintiff and the defendant, wherein the plaintiff sought damages for repudiation of the contract by the defendant, it was proper to award the plaintiff not only the damages accrued up to the time when the bill was filed, but also the damages accruing thereafter until the end of the term, there being evidence permitting the assessment of damages with substantial accuracy.

In certain proceedings in which it appeared that the plaintiff was entitled to a one-third share of the "profit" from the engagements of the defendant as a musician over a certain period, a determination of the defendant's average weekly earning capacity in the period upon the basis of evidence showing his actual earnings from such engagements over a portion of the period, and a calculation of the amount of the plaintiff's share by multiplying the number of weeks in the period by one third of the amount of such earning capacity, disclosed no error; it could not properly be said that they were based on mere conjecture.

Where it was provided, in a contract whereby one was hired as a musical director and vocalist for a certain time, in substance that the employee should not work for anyone other than the employer except with his consent and that the "profit" from the employee's "outside engagements" should be divided between the parties in certain proportions, and during the term of the contract the employee repudiated it but continued to work in "outside engagements," it could not properly be said that loss by the employer of his share of such "profit" was not a proximate result of the defendant's breach of the contract; and it was proper to award the employer the amount of his share in proceedings brought by him against the employee.

After repudiation by the employee of a contract for personal service which required the employer to pay him a specified sum weekly and provided that he should not work for others except with the employer's consent and that his earnings from work done for others should be divided between him and the employer, the weekly sums which would have become due from the employer to him during the remainder of the term of the contract were not to be deducted in assessing the plaintiff's damages in proceedings by the employer against the employee to recover the plaintiff's share of such earnings by the defendant during the same period.

BILL IN EQUITY, filed in the Superior Court on April 9, 1932, and afterwards amended, described in the opinion.

The suit was referred to a master. Material findings by him are stated in the opinion. By order of *Macleod*, J., there was entered an interlocutory decree confirming the master's report, "excepting a finding therein that 'the contract between the parties remains in force until November 1, 1933, a period of seventy-four weeks following the last date of the accounting between the parties, viz: May 31, 1932,' and excepting the finding as to the amount the plaintiff

is entitled to recover." The judge found and ruled "that the contract existing between the parties at the time of the breach thereof by the defendant was for a period commencing November 1, 1931, and ending September 1, 1932; that the contract effected by the exercise of the plaintiff's option was for a similar period, to wit: ten months; that in addition to the damages suffered by the plaintiff as ascertained by the master on the accounting of the parties, to wit: $1,596, the plaintiff is entitled to recover damages for a period commencing May 31, 1932, the date of said accounting, and ending September 1, 1932, and for a further period of ten months at the rate of $33.33⅓ per week, totaling $1,867; and in the aggregate $3,463."

By order of the judge, a final decree was entered on September 29, 1933, ordering the defendant Weeks to pay the plaintiff $3,463 and costs. That defendant appealed from each decree.

The case was submitted on briefs.

*W. E. Weeks*, for the defendant Weeks.

*J. A. Treanor, Jr.*, for the plaintiff.

PIERCE, J. This is a suit in equity whereby the plaintiff seeks an injunction to restrain the defendant Weeks (hereinafter referred to as the defendant) from an alleged violation of the negative stipulation in a contract of personal service made with the plaintiff, whereby the defendant agreed to refrain from working for others than the plaintiff during the term of the contract. The bill of complaint as amended also seeks to recover certain sums of money as "damage suffered by the plaintiff by reason of the failure of the defendant to perform his said agreement," or as due under the terms of the contract as a percentage of earnings paid to the defendant under contracts with third parties. The answer of the defendant alleges that the contract is void for want of mutuality; that, assuming it was valid, the contract was broken by the plaintiff and not by the defendant; that no damages have been suffered by the plaintiff; and that no sums of money are due from the defendant to the plaintiff. The case was heard by a master, to some of whose findings the defendant filed exceptions. Upon fur-

ther hearing upon the report and exceptions thereto an interlocutory decree was entered modifying and confirming the master's report. From this decree the defendant appealed. Thereafter a final decree for the plaintiff was entered and from this decree the defendant appealed to this court.

The master was ordered "to hear the parties, find the facts and report his findings . . . together with such questions of law . . . as any party may request."

The report, in substance, is as follows: The plaintiff conducted an advertising business, principally radio broadcast advertising. There were in his organization a musical director, a radio director, a copy chief or writer and himself. These four, with other minor employees, constituted a planning board. This board analyze the situation, decide what stratum of society they desire to reach in any particular advertising campaign and what area territorially is to be covered. "The actual advertising is done by means of a 'broadcast,' that is, the sending out over the air from a studio a program which has been arranged in advance. This program involves the securing of talent, usually musical, the selection of artists and the music, and the arrangement and timing of the numbers and of the talk by which the advertising is done. The 'show,' as it is called, must be carefully rehearsed and timed, is finally produced in an 'audition' so called, and after being approved by Mr. Rooney and presumably by the advertiser who pays for it, the program goes into production. An 'audition' is in effect a trial of the program, and is often given also to prospective customers as a means of selling the advertising service which is furnished by the plaintiff and similar concerns, as well as to try out a program which has already been adopted."

The musical director in this organization was not merely an orchestra leader. His function as such director was broad and included the general supervision and control over the whole musical production. The radio director is the connecting link between the advertising company and the musical director; he is directly responsible for the type of program used and passes final judgment on the actual

musical numbers to be used. The copy chief or writer takes care of the "continuities," so called, which are the spoken words used in a program, and attends also to publicity in newspapers and similar matters.

The defendant was twenty-five years of age. He started in business playing a piano in an orchestra. In October, 1929, he got together a small orchestra and had several engagements in which he sang and also used his orchestra. In September, 1930, he entered into a contract with the plaintiff. On October 1, 1931, he executed a second contract with the plaintiff which was modified and superseded by a third contract, that took effect on November 1, 1931, to run until September 1, 1932. The last contract is the one on which this suit is based. The first contract did not mention employment of the defendant as a vocalist, but the later two specified that he was to serve as both director and vocalist.

The contract dated November 1, 1931, provides that "In consideration of the mutual promises and agreements herein contained, the said Ranny Weeks enters the service of the Alfred Rooney Company under the following terms: — The said Ranny Weeks agrees to work in the capacity of musical director and vocalist for radio broadcasts with the said Alfred Rooney Company exclusively except as released in writing, temporarily, by the said Alfred Rooney Company from November 1, 1931 to September 1, 1932." And he agrees to "devote his entire time, skill and attention to the said Alfred Rooney Company during the term of this service, and not to work for anybody else during the said term unless with the written consent of the said Alfred Rooney Company," and "to accept no other employment unless mutually agreed upon in writing." The Alfred Rooney Company agreed "to pay the said Ranny Weeks for the satisfactory performance of his duties the sum of $75.00 per week for two programs or less per week and $25.00 for each additional broadcast per week, and also $66\frac{2}{3}\%$ of the net profit from all outside engagements, except as follows: the said Alfred Rooney Company is to allow the said Ranny Weeks 85% of the net profit from the broadcast of

the Gold Stripe Hosiery Company if there be only one broadcast per week for the said Gold Stripe Hosiery Company; if however there shall be more than one broadcast per week for the said Gold Stripe Hosiery Company then the said Alfred Rooney Company will pay the said Ranny Weeks 66⅔% of the net profit of any except the first broadcast." It is also agreed "that the said Alfred Rooney Company shall have an option to renew this contract on its expiration on the following terms: $100.00 per week for two broadcasts or less and $25.00 for each additional broadcast per week, other conditions to remain the same, provided said Alfred Rooney Company shall give notice to the said Ranny Weeks of its desire to exercise said option prior to October 1, 1932." This agreement was signed, sealed and witnessed.

When the defendant, in 1930, commenced work with the plaintiff he was first used as a musical director; he also led the orchestra on several programs put on by the plaintiff; and in one broadcast he sang. On his first program he got together an orchestra, using such musicians as he wished, as this orchestra was to be larger than the one he had been leading. On this first program the defendant sang about two weeks when "he was taken off as a vocalist because his work in that capacity was not satisfactory to the plaintiff," but "he continued on the broadcast as musical director and orchestra leader." From the fall of 1930 until the summer of 1931 "the orchestra, led by the defendant, had a number of outside engagements, and during this period there were many auditions on which the defendant was used as a vocalist. During this period also a broadcast was then in operation for the Fox fur company, which continued until after difficulties arose between the parties in the spring of 1932. On this also the defendant acted as musical director and orchestra leader until March 5, 1932, when he ceased to conduct the orchestra."

From the date of the present contract, November 1, 1931, the plaintiff has had only one contract for broadcasting an advertising program, to wit, the one with the Fox fur company. On this program the defendant has never ap-

peared as a vocalist, two other persons being used in that capacity. The defendant has at all times been anxious to sing and has requested the plaintiff to use him as a vocalist, but auditions in which he sang were not productive of business for the plaintiff. Meanwhile, the defendant procured work for himself as a vocalist on three programs which commenced early in 1932, and also similar work at the Metropolitan Theatre, all with the consent of the plaintiff, as is provided in the contract. The defendant's work as a vocalist had improved meantime, due to study, music lessons, and his opportunity to observe the work of others and his experience generally. During this period the defendant received some publicity through the newspapers, particularly as the result of his work with the Metropolitan Theatre, and in the three broadcasts referred to which he procured for himself.

The outside engagements of the defendant conflicted with his work as orchestra leader on the Fox fur company program, and as the result of a conference on March 5, 1932, it was agreed that the defendant would relinquish his position as an orchestra leader, and one Rakov, a violinist in the orchestra, was appointed to take his place. Notice of this change was given Rakov by the defendant personally. It was further agreed at this conference that Rakov should be given full control of the orchestra, with power to hire and discharge members. Thereafter Rakov "hired and fired" the musicians, rehearsed the orchestra and vocalists and directed the orchestra in the performance of the Fox program. The defendant was not released from his contract but was requested to listen to the Fox programs and report his comments and criticisms to the plaintiff. The defendant did not do this during the following two weeks, because of his work at the Metropolitan Theatre. The plaintiff intended to use the defendant whenever opportunities offered, but it was not shown from the evidence what was the nature or extent of the work which the plaintiff might have been able to secure for the defendant as a vocalist during the remainder of the period covered by the contract.

On March 17, 1932, letters passed between the parties. "Regardless of the postmark," the master finds "that each letter was written and mailed on the same day, to wit, March 17, 1932, and not received by either party prior to the mailing of his own letter," and observes in passing, "that these letters, although indicative of the state of mind of the writer at the time, are not conclusive on the. real issue here." These letters· are printed in the record. The letter of the defendant, in substance, states that he considered that he had been relieved of all duties and that the contract was ended. On the other hand, the letter of the plaintiff expressly affirmed the contract. It authorized the appointment of Rakov as assistant to the defendant, and stated that the defendant was to remain as musical director and to make reports and give advice on musical problems.

A review of the facts bearing on the defendant's employment under the contract dated November 1, 1931, discloses that he was never given a chance to sing; that he was replaced as an orchestra leader and that only minor duties as a musical director were left to him; that the plaintiff affirmed the existence of the contract and duly exercised the option to renew it. The master found that the payment of $75 per week to the defendant was made by the plaintiff either directly or by credit up to March 17, 1932; that since that date the plaintiff has been ready and willing to pay that amount or any larger sum properly due under the terms of the contract; that the defendant has refused to perform any services; and that because of this fact the plaintiff is under no obligation to make further payments.

The facts found further disclose that after March 17, 1932, on March 26, 1932, permission to the defendant to work at outside engagements was revoked, and that the defendant nevertheless continued to work outside and refused to consider the contract in force. It was agreed, and the master found, that the plaintiff's percentages under the contract amounted to $1,596 up to May 31, 1932. Damages for the remainder of the contract period

were assessed by the master. Basing his findings on the evidence of what the defendant had earned from outside engagements for a considerable period of time, the master found that the defendant's average weekly earning capacity was $100, that one third of this was the plaintiff's share under the contract, and multiplying this by seventy-four, the number of weeks after May 31, 1932, found the amount to be $2,467. The number of weeks was modified by the interlocutory order and decree of the Superior Court, and the sum due was established under the item as $1,867. The master found that the services of the defendant were not so unique as to be irreplaceable and that the plaintiff therefore can be compensated in money for any loss he may have suffered by reason of the defendant's refusal to continue under the contract; and further found that the plaintiff has suffered no monetary loss by reason of the substitution of Rakov for Weeks as orchestra leader on the Fox program.

When the bill was brought the contract was in force, and equity properly took jurisdiction to hear the case on the application for injunctive relief. The period provided by the contract for the services of the defendant expired before the case was ripe for a final decree. Thereafter the bill was properly retained for the assessment of damages and the full disposal of the case. *Newburyport Institution for Savings* v. *Puffer*, 201 Mass. 41, 47.

The defendant raises in his brief the following issues: (1) "The contract is void for want of mutuality"; (2) "Admitting for argument the contract to be valid, it was breached by the plaintiff"; (3) "Admitting, for argument, the contract to be valid, the plaintiff is not entitled to damages as assessed"; (4) "The plaintiff is not entitled to damages."

In support of his position that the contract is void for want of mutuality the defendant contends that "The contract gives the plaintiff the right to discharge the defendant WITHOUT RECOURSE by declaring such services unsatisfactory"; that "The contract lacks mutuality in that the employer having the right to terminate the contract, the employee is remediless when such right is exercised. He

can neither secure specific performance of the contract in equity nor damages in an action at law." He further contends that under the agreement and without redress he could have been discharged at any time; that the contract is unilateral in the truest sense and that mutuality of enforceability is just as necessary in specific performance as capacity of the parties, adequacy of consideration or certainty of terms.

In this Commonwealth contracts to be performed to the satisfaction of another may be divided into three classes: (a) those where fancy, taste, sensibility or opinion is involved; *Brown* v. *Foster*, 113 Mass. 136; *Farmer* v. *Golde Clothes Shop, Inc.* 225 Mass. 260, 263; *Fried* v. *Singer*, 242 Mass. 527, 530, 532; (b) those where the question of operation, fitness or mechanical fitness is involved; *Aiken* v. *Hyde*, 99 Mass. 183; *Weinstein* v. *Miller*, 249 Mass. 516; and (c) those where the contract does not in any form of words require that the performance of the work to be done or of the services to be rendered shall be to the personal satisfaction of the promisor. Under (c), if the work was performed in a manner that would be satisfactory to a reasonable man in view of all the circumstances, the mere fact that the promisor was not satisfied is not conclusive against a right of recovery, and there is read into the contract the rule that, that which the law says a party ought to be satisfied with, the law will say he is satisfied with. *Hawkins* v. *Graham*, 149 Mass. 284, 287, 288. *Lockwood Manuf. Co.* v. *Mason Regulator Co.* 183 Mass. 25. *C. W. Hunt Co.* v. *Boston Elevated Railway*, 199 Mass. 220. In the case at bar the words "satisfactory performance of his duties" gave the plaintiff a right to discharge the defendant if he was reasonably dissatisfied with the performance by the defendant of his contractual duties. The services were not to be performed to the personal satisfaction of the plaintiff, and he could not have discharged the defendant unreasonably without liability to pay him damages. The presence of such a provision merely introduces a condition precedent to liability in the one party and to recovery by the other under the contract, and places on the party plaintiff a

burden of proving satisfaction, or the absence thereof, as the case may be, as a part of his case. *Lockwood Manuf. Co.* v. *Mason Regulator Co.* 183 Mass. 25. See Williston on Contracts, §§ 43, 44.

The second position on which the defendant rests his contention of lack of mutuality is that the plaintiff's promise was not an absolute promise to pay $75 a week as a minimum salary, or to pay any other sum unconditionally, but was a promise to pay only for programs; that there was no express promise to furnish any certain amount of work at all; and that therefore the plaintiff could have excused himself from any payments at all under the contract. It is plain that there is an express promise to pay the defendant unconditionally at least $75 a week. The reasonable interpretation of the contract is that $75 is a weekly salary covering two programs, and that all over two are to be paid for in addition each week. The master found that up to the date of the repudiation of the contract by the defendant, $75 had been paid him every week by cash or credit, and was paid from March 5 to March 17, during which time he had not broadcast at all. It thus appears that the interpretation put upon the terms of the agreement to pay the defendant is consistent with the plaintiff's and defendant's practical construction of their agreement. See *Canadian Club Beverage Co.* v. *Canadian Club Corp.* 268 Mass. 561, 569; *Ovans* v. *Castrucci*, 267 Mass. 600, 605. Moreover, it appears by the supplemental report of the evidence, at the defendant's request, that the $75 was a straight weekly salary; that the parties conferred as to what sort of contract was desired and the defendant did not want to sign a contract similar to one he had worked under, but "preferred to receive $75 per week with $25 additional for every broadcast that came in to the plaintiff's agency." It is to be noted that all the evidence is not reported; therefore, there is no way for this court to determine that evidence before the master was insufficient as matter of law to support the findings objected to. And there is no room for the inference, much less for a ruling, that the master was clearly wrong in his findings.

The defendant contends that the contract was broken by the plaintiff in that there was implied in the contract an agreement that the plaintiff should use the defendant or keep him at work; that this was essential to the maintenance and furtherance of his reputation as a vocalist; and that the parties to the contract so understood it.   There is no direct evidence that the parties so understood the contract and there is no evidence of any usage or custom which would import such an implied provision.   See Williston on Contracts, § 1015, for cases bearing upon this contention. In this Commonwealth it was held that the only duty involved was to pay the sum of money due under a contract and that there was no duty to exhibit films so that the publicity desired by a distributor would result.  *Vitagraph, Inc.* v. *Park Theatre Co. of Boston,* 249 Mass. 25, 35, 36. There is nothing in the record here to warrant such a finding by the master.   It follows that this contention is without support.   See *Bunning* v. *Lyric Theatre Ltd.* 71 L. T. (N. S.) 396; *Pollock* v. *Shubert Theatrical Co.* 146 App. Div. (N. Y.) 628.

The only remaining question relates to the assessment of damages.   In equity, damages can be given not only to the date of the commencement of the suit but to entry of the final decree, and an amendment to the bill to cover them may be allowed after rescript.  *Collins* v. *Snow,* 218 Mass. 542, 543–546.   And when more damages fall due after the date of a final decree appealed from, this court may also give leave to amend after rescript to cover them.  *Richards* v. *Richards,* 270 Mass. 113, 123.  *Day* v. *Mills,* 213 Mass. 585.  *Dondis* v. *Lash,* 277 Mass. 477, 486.

The defendant objects and excepts to the estimate and assessment of damages.   His contentions concerning damages are substantially as follows:  (1) that the master's estimation of the average earning capacity of the defendant "from all outside engagements" was based on insufficient facts and was therefore "conjectural and not within the realm of reasonable certainty"; (2) that these outside engagements consisted of contracts secured by the defendant's own initiative and that loss of profits therefrom was "not

the proximate result of the alleged breach of the said contract and could not have been reasonably expected at the time the contract was made to ensue from the breach" of it; and (3) that the $75 a week payable under the contract should be deducted over the same period for which the contract percentages for the plaintiff were computed.

In considering these positions of the defendant it is to be noted that the master had as a basis in assessing the damages evidence of the actual earnings of the defendant, not only before the bringing of this suit but also for almost a year after the suit was brought, and thus was able to determine with substantial accuracy the actual profits which the plaintiff would have realized had the defendant performed his contract. On the subject of prospective earnings or profits and when such can be recovered, see *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 379, 380; *Neal* v. *Jefferson*, 212 Mass. 517; *Hawkins* v. *Jamrog*, 277 Mass. 540.

It is plain from the contract that outside engagements secured by the defendant were within the contemplation of the parties to it. This is shown clearly by the restriction against work for others except as permitted, and by the provision for division of profits from all outside engagements.

In assessing the damages to the plaintiff after the refusal of the defendant on March 17, 1932, to render further services to the plaintiff, the $75 a week was rightly excluded. Before the breach services were to be paid for at the rate of $75 a week. After the breach services were no longer rendered. The plaintiff was deprived of the services for which $75 was the agreed value, and this sum was to be paid only so long as the contract continued and in no way was the obligation to pay $75 a week affected by outside engagements of the defendant.

*Decree affirmed.*