Fall River Line Pier, Inc. *v.* New York, New Haven & Hartford Railroad.

FALL RIVER LINE PIER, INC. *vs.* THE NEW YORK, NEW HAVEN AND HARTFORD RAILROAD COMPANY.

Bristol. February 8, 1962. — April 11, 1962.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, & CUTTER, JJ.

*Landlord and Tenant*, Substitution of premises, Lease to railroad, Eviction. *Practice, Civil*, Jury trial; Claim in set-off; Exceptions: whether error harmful. *Error*, Whether error harmful.

In an action involving a lease by the proprietor of a pier to a railroad providing that the lessor might substitute for the portion of the pier demised other "facilities of equal capacity, including equivalent track and driveway facilities . . . so as to permit the uninterrupted . . . operation of the . . . [railroad's] business," evidence respecting the building originally demised, occupied solely by the railroad, and the trucking access and spur tracks therewith, as compared with substitute space in a larger building offered by the lessor and the trucking access and spur tracks therewith, to be shared with another tenant of the larger building, did not warrant a finding contrary to a finding made by an auditor, constituting prima facie evidence, that the substitute space and facilities offered by the lessor did not comply with the requirements of the lease for a substitution. [185–187]

In an action for rent under a lease for a certain period in which the defence was that the defendant lessee had been evicted during the previous rent period and the defendant filed a declaration in set-off to recover a portion of the rent paid in advance for the previous period, an insistence on a jury trial and reservation of the right to introduce evidence of the defendant's "liability . . . under the . . . lease," filed by the plaintiff following the report of an auditor, applied to the claim asserted in set-off as well as to the original claim by the plaintiff. [187]

Where the evidence introduced at a jury trial of an action following the report of an auditor disclosed nothing to overcome the prima facie effect

of findings of the auditor in favor of the defendant both on the plaintiff's claim and also on a claim by the defendant in set-off, and the judge properly ordered a verdict for the defendant on the plaintiff's claim, no prejudice to the plaintiff appeared in erroneous rulings at the trial that the plaintiff's insistence on a jury trial applied only to the plaintiff's claim and that the "trial . . . [did] not include" the claim in set-off, or in subsequently ordering judgment for the defendant on the claim in set-off on the basis of the auditor's report only. [187]

CONTRACT. Writ in the Superior Court dated January 5, 1959.

The action was tried before *Vallely*, J.

*James A. Heaney*, for the plaintiff.

*John A. Briggs*, (*Arthur D. Healey* with him,) for the defendant.

CUTTER, J. This is an action of contract by Fall River Line Pier, Inc. (Pier), against the railroad to recover quarterly rent of $6,000, for the period February 17 to May 16, 1958, for pier premises leased to the railroad. The railroad filed a declaration in set-off asserting that Pier owed the railroad $4,536.98, with interest, for overpayment of rent for the preceding quarter. The only claim for jury trial was by Pier on the writ. Upon the filing of an auditor's report, Pier insisted "upon its right to jury trial, previously claimed, and reserve[d] the right to introduce evidence of the [railroad's] liability . . . under the . . . lease . . . dated May 17, 1948." The case was tried to a jury. After the plaintiff had rested, the railroad's counsel proceeded to read the auditor's report. The judge ruled that "counsel [was] not to read anything in . . . [the] report concerning the counterclaim"[1] and that "the only issue before the [c]ourt was whether . . . the . . . [railroad] owed . . . [Pier] the sum of $6,000." The judge said "There has been no insistence on the counterclaim. So . . . this trial does not include the counterclaim." Pier claimed an exception to this ruling and to the direction of a

---

[1] The bill of exceptions refers to the railroad's claim based on alleged overpayment of rent as a "counterclaim." Since this case is at law and not in equity, it is more appropriately described as a declaration in set-off. G. L. c. 232, §§ 1, 9. Rule 26 of the Superior Court (1954). Compare Rule 32.

verdict for the railroad in the original action. Later the railroad moved for judgment in its favor on the auditor's report on the declaration in set-off. Pier also claimed an exception to the allowance of this motion. The case is here on Pier's bill of exceptions. The principal questions relate to the interpretation and application of par. 17 of the 1948 lease (quoted below).

The auditor's findings were as follows: On May 17, 1948, Pier, then "in control of . . . premises . . . in Fall River," leased a portion of these to the railroad at an annual rent of $24,000 payable quarterly in advance. Paragraph 17 of the lease reads, "If at any time during . . . this lease . . . the Commonwealth . . . or . . . [Pier] shall elect to extend their [p]ier development so as to include the demised premises . . . [Pier] shall at its expense furnish new facilities *of equal capacity,* including *equivalent track and driveway facilities* which . . . [the railroad] may continue to use in the operation of its business within the demised area or at a location satisfactory to the . . . [railroad], and these new facilities . . . must be made available . . . so as to permit the uninterrupted . . . operation of the . . . business. . . . [T]hese new facilities will be leased to the . . . [railroad] under the same terms . . . herein contained covering the demised premises" (emphasis supplied).

On November 12, 1957, Pier mailed to the railroad a letter stating that Pier, in purported exercise of its rights under the lease, was starting new construction on the leased premises, that this construction would interfere immediately with the railroad's use of tracks serving the demised building, and that the building would not have the use of any railroad sidings after December 1, 1957. This had the effect of depriving the railroad of essential attributes of the then leased building and would amount to constructive eviction (see *Charles E. Burt, Inc.* v. *Seven Grand Corp.* 340 Mass. 124, 127, and authorities cited) unless the new premises, described below, offered to the railroad complied with par. 17.

182                                              344 Mass. 179

Fall River Line Pier, Inc. *v.* New York, New Haven & Hartford Railroad.

In the letter of November 12, Pier offered to the railroad substitute facilities on the same pier property. These facilities were served by two railroad sidings and were then being used by at least one other tenant, with whom the railroad would have had to share use of the sidings. A duly authorized representative of the railroad immediately advised Pier that the new facilities would not permit the railroad to operate as economically or as satisfactorily as theretofore and that the railroad would not accept them. As a consequence, the railroad moved on December 10, 1957, and relinquished the demised premises to Pier. The auditor concluded (a) "that the new facilities . . . compared with those that [the railroad] had been occupying, were not of equal capacity and did not include equivalent track and driveway facilities and would not permit" as economical and satisfactory operation as theretofore, and (b) "that the [railroad's] refusal . . . to accept the new facilities was not unreasonable."

Rent payments under the lease were made by the railroad in advance, including the payment due on November 17, 1957. The quarterly payment of $6,000 due on February 17, 1958, which Pier seeks to recover, was not made. The railroad claimed to have been constructively evicted on December 10, 1957, and by its declaration in set-off sought to recover a proportional part of the quarterly rent paid on November 17, 1957. The auditor found for the railroad on Pier's declaration and for the railroad on its declaration in set-off in the sum of $4,536.97 with interest.

Pier, at the trial before a jury, presented, among other matters, the additional evidence stated below. Pier operated in Fall River a pier which ran generally east and west. The pier, entered from the east side, was "more or less rectangular and was surrounded on the north, west, and south sides by water." In 1957, there were two buildings on the pier, a small one story frame building, fifty years old, on the north side, and a larger marine terminal, built in 1955, on the south side.

The small building, then leased to the railroad, contained

344 Mass. 179                                                                    183

Fall River Line Pier, Inc. *v.* New York, New Haven & Hartford Railroad.

12,000 square feet of space (200 feet by 60 feet).  On its
south side (where there were no railroad tracks) there were
nine wooden sliding doors, used for the receipt of freight
from trucks.  Trucks were backed up to these doors to dis-
charge cargo.  On the north side, there were eight sliding
doors, not all of which could be open at once, leading to two
railroad tracks.[2]  Six freight cars could be accommodated
at one time on the tracks north of the smaller building.
There were no other tenants in this building.

The railroad, in 1957 and theretofore, placed freight cars
on the tracks north of the smaller building to be loaded
through the doors on that side.  The cars would not be
separated.  There was no platform on the north side and
freight was never unloaded from trucks on that side.
"Operating from the smaller building it was necessary to
discharge cargo on the south side, truck it through the
building [where the railroad sorted and classified the
freight] over a deteriorated wooden flooring on hand trucks
and [have railroad employees] load it on . . . freight cars
on the north side."  This was a "continuous operation."

The floor of "the smaller building was approximately 18
inches from the ground and was thus 2½ to 3½ feet beneath
the trucks from which cargo was unloaded.  The distance
from the north side of the smaller building to the freight
car on the tracks was approximately five feet which neces-
sitated the placing of a six foot plate from the building to
the cars."  It took two men to handle this plate.  The
smaller building was not used for the storage of freight.

The two tracks on the north side of the smaller building
joined each other east of the building and continued to the
east as a single track.  A short distance east of Pier's
premises, this single track passed an open shed used in 1957
for loading and unloading of freight.

The larger building (600 feet by 160 feet) is approxi-
mately 200 feet south of the smaller building.  It has one
spur track on its south side and two spur tracks on its north

---

[2] One of these tracks was removed by Pier on December 8, 1957.

side.   The interior floor is of concrete, except for an asphalt perimeter.   Forty foot "bays" on each side of the building are separated by concrete and steel columns.   On both the north and the south side are fifteen doors which roll up from the floor.   The tracks on the north side are depressed below the roadway and are adjacent to a platform, eight feet wide, running the length of the building approximately five feet from ground level.   The platform thus is flush with the floor of trucks which back up to it.   A canopy extends out over this platform.   The distance from the platform to freight cars is eight to twelve inches.   One man can handle the plate needed to cover this gap.   There is no platform on the south side.

The railroad in December, 1957, was offered 11,280 square feet of area at the larger building.   Ninety-six hundred square feet of this area lay inside the building and there were 1,680 square feet of outdoor platform space.   The space, so offered, would have been on the same rental terms in effect under the 1948 lease.   There were no other tenants in this larger building in 1957, except Acme Fast Freight, Inc. (Acme), which during that year used the bays and three doors at the east end of the north side of the building.

At the north side of the larger building, freight cars could be put in, three cars on each track.   They could then be separated, leaving openings between them, so that the trucks could back up to do their business.

A railroad employee was permitted to testify, over Pier's objection, that in the larger building the railroad "couldn't operate as efficiently or safely."   The testimony indicated that this was because of the impossibility of the same sort of continuous operation, as in the smaller building, the necessity of handbraking cars and separating them, and the possible interference by Acme with freedom of use of the spur tracks.   Each time the railroad would "go in there, . . . [it] would have to make Acme stop loading, so that" the railroad could "put a switcher in."   Freight dropped on the platform north of the larger building would be exposed and would have to be "handle[d] . . . a second time."

A former supervisor for Acme testified that the "difference between operating from the larger building and from the smaller building was that . . . trucks would discharge cargo on the same side [of the larger building] as cargo would be loaded on to freight trains. It was possible . . . to separate . . . [the railroad cars] to allow trucks to unload at the platform beside the cars. It was also possible to leave the cars joined together and to unload the trucks from either end of the cars."

1. Under par. 17, if the railroad is to be required to accept new facilities, these must be "of equal capacity, including equivalent track and driveway facilities." These words refer to equal practical usefulness of the facilities in the railroad's freight operations, for they must be facilities "which the . . . [railroad] may continue to use in the operation of its business within the demised area or at a location satisfactory to the" railroad. The provision does not purport to require that the new facilities be "satisfactory" to the railroad in any respect other than location. Premises within 200 feet of the old location can hardly reasonably be regarded as unsatisfactory because of location, if otherwise equal to the old. This is not a case where mere questions of taste affect whether the new facilities are of equal capacity. The railroad was bound to accept the new space, if that space had "equal capacity," in the sense that it would reasonably meet the railroad's operating needs and permit equally efficient performance of the same volume of operations (see *Steel Storage & Elev. Constr. Co.* v. *Stock,* 225 N. Y. 173, 176) without increased expense and inconvenience. It could not object on trivial and inconsequential grounds. See *Hawkins* v. *Graham,* 149 Mass. 284, 288; *Salem Glass Co.* v. *Joseph Rugo, Inc.* 343 Mass. 103, 105–106. See also *Handy* v. *Bliss,* 204 Mass. 513, 519–520; *Rooney* v. *Weeks,* 290 Mass. 18, 27; Williston, Contracts (3d ed.) § 675A, p. 204, § 675B. Compare *Weinstein* v. *Miller,* 249 Mass. 516, 518–519; *Jacob & Youngs, Inc.* v. *Kent,* 230 N. Y. 239, 243–244.

The auditor's findings that the new facilities were not of

equal capacity, and did not include equivalent track and driveway facilities, constitute prima facie evidence to this effect, until additional evidence appears that warrants a finding to the contrary. *Cook* v. *Farm Serv. Stores, Inc.* 301 Mass. 564, 566. A verdict for the railroad in the original action was properly directed unless the additional evidence before the jury would warrant contrary findings.

In the proposed quarters (1) the railroad would have 2,400 square feet less inside space than before; (2) it would occupy a small part of a large building (with access on one side only to the railroad's quarters) rather than the whole of a small building (with access on all sides); and (3) it would have to share both the large building and its adjacent side tracks[3] with at least one other tenant using side tracks over which the railroad must move freight cars to reach its own space. This much cannot be questioned, although there might be some compensatory advantages to the railroad in a more modern structure and more conveniently arranged floor levels.

We conclude that no evidence affords sufficient basis for a verdict contrary to the auditor's findings. The fundamental disadvantages of lesser inside space, occupancy of only part of a large building, a different method of loading, and sharing of side track facilities cannot be disregarded. The evidence that the larger building had compensatory advantages does not furnish basis for a finding that the new facilities had capacity equal to that of the older building. Nor is such a finding warranted by the circumstances that Acme in 1957 rented 5,000 square feet in the larger building (three bays) and in 1960 conducted the same operation in the smaller building, which it formerly had conducted in the larger. This proof would not establish that the railroad would be able to conduct effectively the same business in six bays (9,600 square feet) of the new building plus some out-

[3] The spur tracks at the old building, also, may have been subject to some interference (comparable to that caused by Acme's presence in the larger building) because of loading and unloading at the small shed to the east of the older building.

door platform space, which it had theretofore conducted in the 12,000 square feet of the smaller building. Any equality in the two locations, from the standpoint of the railroad, is left by the evidence wholly to conjecture. The interpretation of what was required by par. 17 was, of course, for the court, not the jury. See *Whittaker* v. *Brookline,* 318 Mass. 19, 23–24; *Ober* v. *National Cas. Co.* 318 Mass. 27; Williston, Contracts (3d ed.) § 616. In the original action, a verdict was properly directed for the railroad.

2. The plaintiff's seasonable claim of jury trial (see G. L. c. 231, § 60; Rule 44 of the Superior Court [1954]) applies also to the issues raised by the declaration in set-off. See G. L. c. 232, §§ 1, 8. Pier's insistence upon jury trial (Rule 88 of the Superior Court [1954]) adequately preserved its rights to such a trial on the set-off issues. Also Pier's reservation of "the right to introduce evidence of the liability of the . . . [railroad] under the . . . lease" was sufficient reservation of the right to offer evidence on the issue raised in set-off.

We have held that there was no evidence at the trial before the jury that would warrant a finding that the proposed new premises were of equal capacity to the old.[4] It thus is immaterial that the judge ordered judgment for the railroad on the declaration in set-off, after considering only the auditor's report. There was no evidence sufficient to offset the effect of the auditor's report as prima facie evidence. Consequently, even if the set-off issues had been tried before the jury, the case could not have been submitted to them.

*Exceptions overruled.*

---

[4] The bill of exceptions shows that Pier offered no evidence at the trial before the jury specifically upon the set-off issues. The only evidence offered by Pier, and excluded, appears to have been excluded for reasons unconnected with the set-off matter. Exceptions to the exclusion of this evidence have not been argued.