SUSAN GOLDHOR vs. HAMPSHIRE COLLEGE & others.[1]

No. 87-63.

Hampshire.  January 8, 1988. — April 27, 1988.

Present: GRANT, DREBEN, & FINE, JJ.

*Practice, Civil,* Directed verdict. *Contract,* Employment. *Employment,* Termination. *Practice, Civil,* Affirmative defense, Burden of proof. *Damages,* Breach of contract. *Evidence,* Expert opinion. *Libel and Slander. Words,* "Just cause."

Where, at the trial of an employee's claim for breach of her employment contract, there was evidence that an employee manual mantained by her employer required that certain procedures be followed when an employee's conduct was considered unsatisfactory "except in extenuating situations," and that the employer did not comply with those requirements, and where a question of fact for the jury was presented as to whether an "extenuating" situation existed, relieving the employer from such compliance, the judge erred in directing a verdict for the employer on the contract claim. [717-721]

That an employee who had been reduced in rank received her entire compensation called for by her employment contract did not preclude an award of damages in her action against her employer for breach of the contract. [721]

Discussion of the requirement of "just cause," as applicable to the discharge of an employee before the expiration of the employee's contractually-fixed term of employment. [721-723]

At the trial of an employee's claim against a college for breach of her employment contract, the judge did not abuse his discretion in excluding testimony by the plaintiff's expert witness to the effect that termination of a person's employment in an academic position prior to the expiration of its term makes it difficult for the discharged person to be hired elsewhere in the academic community. [723]

At the trial of a college employee's defamation claims against the college and its president in which the plaintiff contended that the defendant's very announcement of her suspension carried defamatory implications in that the suspension implied her wrongdoing or incompetence, the judge correctly directed verdicts for the defendants. [723-724]

[1] Adele Simmons and Raymond P. Coppinger.

At the trial of an employee's claim against a coworker for interference with contractual relations, the judge's directing a verdict for the defendant, even if erroneous, did not prejudice the employee, where her claim against the same defendant for interference with an advantageous business relationship was submitted to the jury with appropriate instructions and the jury found in the defendant's favor. [724-725]

CIVIL ACTION commenced in the Superior Court Department on October 26, 1983.

The case was tried before *John F. Murphy, Jr.,* J.

*Stewart T. Graham, Jr.,* for the plaintiff.

*David R. Kaplan (H. Gregory Williams* with him) for the defendants.

DREBEN, J. On February 17, 1981, the plaintiff lost her job as director of the New England Farm Center (the Center) at Hampshire College. This action, brought on a number of theories,[2] against the college, its president, and against Raymond P. Coppinger, a professor and researcher at the Center, followed. After the close of the defendants' case, a judge of the Superior Court directed verdicts for the college and its president on all claims and for Coppinger on one claim.[3] The remaining claims against Coppinger were submitted to a jury, which found for Coppinger. We hold that the judge should not have directed a verdict for the college on the contract claim. The employee manual of the college required that certain procedures be followed where an employee's conduct was considered unsatisfactory "except in extenuating situations." The college did not comply with those requirements, and whether an "extenuating situation" existed, relieving the college from such compliance, presented a question of fact for the jury. There was no other reversible error.

1. *Contract claim against the college.* Upon review of the allowance of a motion for a directed verdict, we "view the evidence most favorable" to the plaintiff to determine "whether

---

[2] The plaintiff alleged breach of contract and defamation on the part of the college, defamation on the part of its president, Adele Simmons, and interference with contractual and advantageous relations and defamation on the part of Raymond P. Coppinger.

[3] Interference with contractual relations.

'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.'" *Boyle* v. *Wenk*, 378 Mass. 592, 593 (1979) (citations omitted). *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 660 (1981).

The plaintiff was the director of the Center from its inception in September, 1978, until her suspension in February, 1981. She was also an adjunct faculty member of the school of natural sciences. Prior to 1978, with a one-year hiatus, she had been dean of natural sciences and associate professor of biology. As director of the Center she was responsible for fund raising and for overseeing the research projects and personnel of the Center.

The president of the college recognized that the director's position required a long-term commitment. The plaintiff, however, was given a series of one-year employment contracts because the position was dependent on the plaintiff's raising money for her salary each year. At the time she was relieved of her duties as director, in February, 1981, she had a contract for the year 1980-1981 which did not expire until June 30, 1981. Sufficient funds had been raised for her salary for the next fiscal year.[4] The contract with the college for the 1981 fiscal year was formed by a letter offering to renew the plaintiff's appointment beginning July 1, 1980, and an acceptance in writing by the plaintiff. The letter stated: "This is a twelve month position, on a full time basis, at an annual salary of $29,384, plus fringe benefits as described in the Administrator's Handbook, enclosed."

The Administrator's Handbook referred to in the letter set forth procedures, reproduced in the margin,[5] to be followed

---

[4] The evidence recounted in the text was sufficient to submit to a jury the question whether the plaintiff had an implied contract for future years conditioned on obtaining funding.

[5] "H.   UNSATISFACTORY WORK PERFORMANCE

"If a supervisor decides that an employee's work performance is unsatisfactory, the procedures below must be followed (except in extenuating situations):

Regular conferences between the employee and supervisor must be initiated.

except in "extenuating situations" in the event of an unsatisfactory work performance by an employee. As indicated earlier, the procedures were not followed, the claim of the college being that there were "extenuating" circumstances. No argument is made by the college that the handbook was not part of the plaintiff's contract.

The suspension arose out of differences between the plaintiff and Coppinger, the researcher in charge of a central project of the Center and a tenured professor at the college. Coppinger wanted to do his own negotiating for funding. The plaintiff responded by trying to have Coppinger leave the Center. At a meeting with the president, the dean of natural sciences and Coppinger, the plaintiff presented a formal plan to separate Coppinger from the Center. Coppinger got angry and walked out.

A few days later, at another meeting, the plaintiff asked for more money for the Center and explained her reasons for suggesting Coppinger's separation from the Center. He had been rude to her in front of employees and had negotiated funds for projects without her knowledge. These actions, she asserted, undercut her authority. If project managers did their own funding, she would be unable to raise funds. She told Coppinger, according to her testimony, "I don't want you to ever speak to me that way again in front of the employees, and I want you to run all funding projects by me before you actually make contact with the funders." Again, according to her testimony, Coppinger became angry.

The reasons for initiating such conferences must be documented and placed in the employee's personnel file.

Should a written warning or reprimand be issued by the supervisor, a copy must be given to the employee.

"If the conferences or a probationary period do not bring about the improvement deemed necessary by the supervisor, he/she may issue, upon authorization of the President, or in his absence another senior administrator of the College, a termination notice. This must be a written statement which gives the reasons for termination and the effective date. The employee is offered the option of resigning in all but extreme cases. The College retains the right to determine the termination date and severance agreements.

"The employee may appeal the termination decision through the grievance procedures outlined in the following section."

The president subsequently told a colleague of the plaintiff that Coppinger would not accept the plaintiff at the Center "in any form" and that it was his view that the Center could not continue with both of them there. The president was also reported to have said that the plaintiff would have to be the one to leave, as Coppinger had a long-term faculty contract.

Shortly after these meetings, on February 17, 1981, the plaintiff was notified by letter[6] that her authority and responsibilities as director were suspended and that it was "very unlikely" that she would be asked to resume those responsibilities. She was, however, allowed to continue as an adjunct faculty member and continued to receive the compensation provided by her contract. She was also offered the adjunct faculty position for the following year, which she refused.[7]

a. *Administrator's Handbook.* The handbook provides, see note 5, *supra*, that, if a supervisor decides that an employee's work performance is unsatisfactory, regular conferences must be initiated. If these conferences or a probationary period do not bring about an improvement, a notice of termination may be given. The obvious import of the provisions is that, even where there is cause for dismissal, in the absence of "extenuating" circumstances, an employee is not to be fired unless the employer follows the procedures set forth in the manual. The steps are designed to improve the employee's performance and, if possible, to avoid termination. See *Woolley* v. *Hoffmann-LaRoche, Inc.*, 99 N.J. 284, 308, modified in respects not here material, 101 N.J. 10 (1985). See also *Pine River State Bank* v. *Mettille*, 333 N.W.2d 622, 631 (Minn. 1983).

The showing of an "extenuating" situation is an affirmative defense, and the college must shoulder the burden of proof. See *Chaplain* v. *Dugas*, 323 Mass. 91, 93 (1948). Whether such a situation was present is a question of fact for the jury. *Ibid.* See *Sherman* v. *Rutland Hosp., Inc.*, 146 Vt. 204, 209

---

[6] The text of the letter is reproduced in the Appendix to this opinion.

[7] At oral argument in this court counsel indicated that this was an unpaid position.

(1985). Contrary to the college's claim, we do not consider the language of the handbook to reserve to the president, as matter of law, the right to assess the existence of "extenuating" circumstances.[8] Contrast *Simpson* v. *Western Graphics Corp.*, 293 Or. 96, 100-101 (1982). Nor can we assume that, had the college followed the procedures, the plaintiff, a person who had been associated with the college for seven years and had been a dean for four years, might not have modulated her conduct to the college's satisfaction. See *Woolley* v. *Hoffmann-LaRoche, Inc.*, 99 N.J. at 308, where the court held it would be unfair to allow the employer to claim that procedures which it wrongfully refused to apply would not have benefited the employee. See also *Pine River State Bank* v. *Mettille*, 333 N.W.2d at 631.

That the employee received her entire compensation for the year does not preclude an award of damages. A reduction in rank may be a breach of contract even if there is no reduction in pay or benefits. *Kravetz* v. *Merchants Distribs. Inc.*, 387 Mass. 457, 462 (1982). *Miller* v. *Winshall*, 9 Mass. App. Ct. 312, 317-318 (1980). Moreover, if there was an implied contract for the next year, see note 4, *supra*, there would be additional damages.

b. *Just cause*. If, on retrial, the fact finder should determine that there were no "extenuating" circumstances, then damages should be assessed and the question of just cause need not be determined. See *Woolley* v. *Hoffmann-LaRoche, Inc.*, 99 N.J. at 307-308. The latter issue would arise only if there is sufficient evidence to permit a fact finder reasonably to infer that the plaintiff would have rejected all suggestions or to infer that the plaintiff was in no way prejudiced by the failure to follow the handbook.

If, on retrial, the fact finder (or the judge, if other parts of the handbook make the point clear) should decide that there were "extenuating" circumstances, or in the unlikely event that it can be shown that there was no prejudice to the plaintiff by the failure to follow procedures, the issue whether there was just

[8] Only part H of the handbook is contained in the record before us.

cause for the termination will be presented. This is so because an employee with a contract for a term certain may only be terminated prior to the expiration of that term for justifiable cause. *Mahoney* v. *Hildreth & Rogers Co.*, 332 Mass. 496, 499 (1955). As the existence of just cause is an affirmative defense, "commonly a question of fact, it rarely can be ruled as matter of law that it has been sustained." *Chaplain* v. *Dugas*, 323 Mass. at 93.

Because there will probably be a retrial on the question of "extenuating" circumstances, and because the question of just cause may depend on many of the same facts, we think that issue, too, should be retried. Accordingly, we need not decide whether the trial judge was correct in determining that this is one of the rare instances where, taking the facts most favorable to the plaintiff, the issue of just cause should have been taken away from the jury. We note, however, that whether there is a jury question is not as clear as the plaintiff maintains.

As we disagree with some of her suggestions, we discuss briefly the principles which will be applicable at retrial. The plaintiff contends, relying on *Stevens* v. *G.L. Rugo & Sons*, 209 F.2d 135 (1st Cir. 1953), that the determination of just cause is an objective question. In that case, the First Circuit, applying Massachusetts law, held that the term "satisfactory" to the employer in the oral employment agreement of the parties meant whether "a reasonable [person] in the defendant's position would have been satisfied with the plaintiff's performance." *Id.* at 140. The court laid stress on the fact that the plaintiff was employed in a "highly technical capacity, one in which matters of taste, fancy and sensibility were in no way concerned." *Id.* at 139. For this reason, and because there was no evidence that the parties used the word "satisfactory" in a subjective sense, the court applied an objective test.

Not only is the term "satisfactory" not involved, but here, unlike *Stevens*, the position is the directorship of the Center, the top oversight position of the facility. In this context, "just cause" must necessarily leave some scope for the exercise of subjective judgment on the part of the employer. Indeed, in construing "just cause" in connection with a lesser, managerial

role (administrative director of the department of health policy and management at the Harvard school of public health), this court in *Klein* v. *President of Harvard College*, *ante* 204, 208 (1987), adopting the construction given in *G & M Employment Serv., Inc.* v. *Commonwealth*, 358 Mass. 430, 435 (1970), appeal dismissed, 402 U.S. 968 (1971), found "just cause" to mean: "[T]here existed (1) a reasonable basis for employer dissatisfaction with a[n] . . . employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge *reasonably related, in the employer's honest judgment, to the needs of his business.* Discharge for a 'just cause' is to be contrasted with discharge on unreasonable grounds or arbitrarily, capriciously, or in bad faith" (emphasis supplied). The *Klein* definition applies here.[9]

c. *Expert testimony.* We see no abuse of discretion in the exclusion of testimony by the plaintiff's expert to the effect that termination of an academic position prior to its expiration makes it difficult for the discharged person to be hired elsewhere in the academic community. The judge could reasonably have determined that such testimony would not assist the jury. See *Simon* v. *Solomon*, 385 Mass. 91, 105 (1982).

2. *Claim of defamation against the college and its president.* The judge correctly directed verdicts for the college and its president on the defamation claims. The plaintiff argues that the very announcement of suspension carries defamatory implications in that the suspension implies the wrongdoing or incompetence of the plaintiff. The plaintiff relies on a North Dakota

---

[9] Depending on the circumstances, courts have used varying tests to determine "just cause." For example, one court has used a subjective test for interpretation of the term as used in an employee's handbook. *Simpson* v. *Western Graphics Corp.*, 293 Or. at 100-101. Other courts focus on the nature of the position (as we have) and permit "substantial scope for the exercise of subjective judgment" where an employee holds a management position. See, e.g., *Crosier* v. *United Parcel Serv., Inc.*, 150 Cal. App. 3d 1132, 1139-1140 (1983). Other authorities look to whether the discharge was objectively reasonable, even where managerial employees are involved. See, e.g., *Hodge* v. *Evans Fin. Corp.*, 823 F.2d 559, 568-569 (D.C. Cir. 1987).

case, *Gowin* v. *Hazen Memorial Hosp. Assn.*, 311 N.W.2d 554, 558 (N.D. 1981), a case which was dismissed on the pleadings. In the same case on further appeal after remand, the Supreme Court of North Dakota rejected the "novel argument" that a demotion is itself evidence of slander, saying, "[T]he demotion was not false and any inferences which may have been drawn by third parties as a result of the demotion does not make the demotion itself slanderous." *Gowin* v. *Hazen Memorial Hosp. Assn.*, 349 N.W.2d 4, 10 (N.D. 1984). *Sadler* v. *Basin Elec. Power Coop.*, 409 N.W.2d 87, 89 (N.D. 1987).

To the extent that the plaintiff relies on the publication of the letter of suspension, see Appendix, or the president's statement to the college's trustees and to a contributor to the Center, she is not entitled to relief. Even assuming that the letter could be deemed defamatory, but see *Ricci* v. *Crowley*, 333 Mass. 26, 27 (1955), an employer "has a conditional privilege to disclose defamatory information concerning an employee when the publication is reasonably necessary to serve the employer's legitimate interest in the fitness of an employee to perform his or her job." *Foley* v. *Polaroid Corp.*, 400 Mass. 82, 94 (1987), quoting from *Bratt* v. *International Business Machs. Corp.*, 392 Mass. 508, 509 (1984). "[W]hen . . . [an] employer make[s] statements that defame an employee, and the information disclosed by those statements is reasonably related to the employer's legitimate business interests, the employee has the burden to prove that the statements were made recklessly, that is, that they were unnecessary, unreasonable, or excessively published." *Id.* at 95.

Copies of the letter were sent to persons associated with the Center and the college. There was no evidence of reckless dissemination nor, contrary to the plaintiff's contention, was there any evidence of a reckless failure on the part of the college to investigate. See *Dexter's Hearthside Restaurant, Inc.* v. *Whitehall Co.*, 24 Mass. App. Ct. 217, 223 (1987) ("[s]imple negligence, want of sound judgment, or hasty action will not cause loss of the privilege").

3. *Claim against Coppinger for interference with contractual relations.* We are unable on the abbreviated record before

us to review the judge's action in directing a verdict for Coppinger on the claim of interference with contractual relations, or to determine how or whether, as the plaintiff claims, she was precluded from arguing that there was a causal relationship between the suspension and the failure to reappoint her. See *Kunen* v. *First Agricultural Natl. Bank*, 6 Mass. App. Ct. 684, 689 (1978). In any event, even if the judge's ruling was erroneous, we are unpersuaded by the plaintiff's claim of prejudice because her claim of interference with an advantageous business relationship was submitted to the jury. The judge specifically charged, "it is not necessary for the plaintiff to prove that she had an existing, binding contract for future employment at Hampshire College. She need only prove a probable future business relationship from which there is a reasonable expectancy of financial benefit."

The judgment for the defendants is affirmed except insofar as it dismisses the contract claim against Hampshire College, and the case is remanded for further proceedings consistent with this opinion. The plaintiff is to have costs of this appeal as against the college.

*So ordered.*

APPENDIX.

February 17, 1981

Susan Goldhor
Hampshire Village
11 Autumn Lane
Amherst, MA 01002

Dear Susan,

This letter is to confirm the administrative decision I made on Monday, February 16, to suspend your authority and responsibilities as Director of the Farm Center. I have asked Penina Glazer to assume the position of Director temporarily and to make recommendations to me by March 15, 1981. These recommendations will deal with the future structure and organization of the Farm Center.

Although no options are precluded from these recommendations, it is very unlikely that you will be asked to resume the authority and responsibilities of the Director of the Farm Center.

The College will continue to honor the compensation requirements of your current contract. You will also continue as an Adjunct Faculty member in the School of Natural Science. We ask that you in turn continue to work on specific projects with which you are involved and either bring them to a conclusion or transfer them to some other appropriate person. You should not initiate any new projects and/or activities on behalf of the Farm Center.

You should keep Penina informed of all ongoing activities and your progress on completing outstanding projects and reports. In addition, you should send copies of all correspondence with persons and/or institutions external to the College to Penina.

Needless to say, this has been a painful and difficult time for everyone involved, and I regret that the situation, in my view, called for the direct intervention on the part of the College.

Sincerely,

Adele Simmons

ADS/nlf
cc: Penina Glazer, Allan Torrey, Arthur
     Westing, Ray Coppinger, John Torrey

Signed in President Simmons' absence