**William HAMILTON and Charlene Hamilton, Plaintiffs,**

v.

**BAYSTATE MEDICAL EDUCATION AND RESEARCH FOUNDATION, INC., Baystate Medical Center, Inc., and Baystate Health Systems, Inc., Defendants.**

Civ. A. No. 92–30179–MAP.

United States District Court, D. Massachusetts.

Oct. 27, 1994.

Francis W. Bloom, Wilbraham, MA, for plaintiffs.

Toby G. Hartt, Jay M. Presser, Skoler, Abbott & Presser, Springfield, MA, for defendants.

## MEMORANDUM REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PONSOR, District Judge.

### I. INTRODUCTION

This action arises from the termination of employment in 1989 of Dr. William Hamilton, a pathologist at Baystate Medical Center in Springfield, Massachusetts. Dr. Hamilton alleges breach of contract, as well as negligent and intentional infliction of emotional distress. In a separate count, Charlene Hamilton, the doctor's wife, alleges a claim for loss of consortium.[1] Defendants Baystate Medical Center, Inc. ("Baystate"), Baystate Medical Education and Research Foundation, Inc. ("BMERF") and Baystate Health

---

1. Plaintiff has stipulated to the dismissal of Count I (alleging wrongful termination under the Employee Retirement Income Security Act, 29 U.S.C. § 1140). Count II (alleging wrongful discharge) was dismissed by this court on December 18, 1992.

Systems, Inc. ("BHS") have moved for summary judgment on all counts.[2] Upon review, and for the reasons set forth below, summary judgment will be granted for defendants on all remaining counts in plaintiffs' complaint.

## II. *SUMMARY JUDGMENT STANDARD*

■ Summary judgment is appropriate only " ... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter as law." Fed.R.Civ.P. 56(c). A factual dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988), quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ Although the court must view the record favorably to the nonmoving party, the nonmoving party must set forth "specific facts sufficient to demonstrate that every essential element of its claim or defense is at least trialworthy." *Catrone v. Thoroughbred Racing Association,* 929 F.2d 881, 884 (1st Cir.1991). "If evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510.

## III. *FACTUAL AND PROCEDURAL BACKGROUND*

The undisputed facts are as follows.

William Hamilton had worked as a pathologist at Baystate since June 15, 1970. Beginning in 1986, defendants claim that Hamilton's performance as a pathologist began to deteriorate and became progressively worse with each passing month. The first indication of Hamilton's slip in performance was when he incorrectly labelled a specimen in his pathology report in January of 1986, causing some confusion in the Medical Records Department. A year later, in January 1987, a customary review of one of Dr. Ham-

ilton's cases revealed a serious misdiagnosis. In a biopsy of a right and left breast, Hamilton incorrectly diagnosed a tumor in the right breast as benign rather than malignant, and improperly classified the tumor in the left breast. On August 26, 1988, Dr. John P. Sullivan ("Sullivan"), Hamilton's supervisor and the Chairperson of the Pathology Department, met with Hamilton. They discussed three more cases in which Hamilton erred in either the diagnosis or labelling of the specimen. Lastly, and most tragically, in November 1988, Hamilton misdiagnosed a sample of breast tissue and concluded that the patient had cancer of the right breast. As a result, the patient underwent an unnecessary mastectomy as well as chemotherapy and radiation treatment.

On January 19, 1989, Sullivan suggested to Hamilton that he take some vacation time to determine if he was ill. At this time, Sullivan also told Hamilton that he should consider resigning. January 19, 1989 was the last day plaintiff performed his duties at Baystate.

At about that time, Hamilton learned that he had been suffering from Graves Disease for roughly the previous three years. Graves Disease causes the body's immune system to attack the thyroid gland and results in the production of excessive thyroid hormone, resulting in the impairment of a person's memory and ability to concentrate. Dr. Haag, Hamilton's treating physician, characterized his condition as severe and believed the Graves Disease was most probably responsible for Dr. Hamilton's drastic slip in performance as a pathologist. Hamilton then filed for long term disability benefits in April of 1989. While his application for long term disability benefits was pending, Hamilton was placed on sick leave. He used up all five months of his paid vacation and sick time.

By late spring of 1989, Hamilton's thyroid hormone levels were within normal limits and controlled by medication. In an August 25, 1989 letter to Sullivan, Hamilton indicated that he intended to return to work on September 1, 1989. In this same letter he also

stated that he did not view himself as being "cured." Sullivan denied Hamilton's request to return to work.

Sullivan, Hamilton and other physicians met at Baystate on September 1, 1989. At this meeting, Hamilton reiterated his desire to return to work on a part-time basis. Dr. Sullivan once again denied his request, claiming that he was concerned about patient safety. Hamilton alleges that no one at this meeting told him he was formally discharged.

On September 7, 1989 Hamilton wrote Sullivan asking to return to work on September 11, 1989. The following day, Sullivan phoned Hamilton. Plaintiff alleges that during this phone conversation Sullivan did not inform him that he was discharged. Defendants claim that by this time they had effectively discharged Hamilton.

In September of 1989 plaintiff retained an attorney to negotiate a settlement on his claims against the hospital. Plaintiff denies that he was ever told that he was terminated. Hamilton received final approval of disability benefits in February of 1990.

Defendants move for summary judgment on each of the four remaining counts. The counts allege breach of contract (Count III), negligent infliction of emotional distress (Count IV), intentional infliction of emotional distress (Count V), and loss of consortium (Count VI). The court will address each count below.

## IV. DISCUSSION

### A. Breach of Contract: Count III

Plaintiff alleges that defendants breached their employment contract by terminating him without just cause and by not following the pre-termination process set forth in the staff guidelines. Defendants contend that the deterioration in Hamilton's performance was sufficient to justify his termination in the manner employed.

### 1. Termination of Employment Contract

■ Hamilton alleges his firing breached the employment contract he had with BMERF. BMERF was created in 1986 in order to bill privately for physicians' services performed at Baystate. After its creation, all members of the Pathology Department were required to become BMERF members. Each year individual members and BMERF execute member agreements. Although the yearly renewal of the contract is customary, it is unknown whether a BMERF agreement was ever executed between Dr. Hamilton and BMERF for 1989.

■ Although plaintiff is unable to produce an express contract covering 1989, when viewing the facts in the light most favorable to the plaintiff, the court assumes that there was, at a minimum, an implied contract between Dr. Hamilton and defendants.[3] Under the express terms of the member agreement with BMERF, defendants retained the right to terminate employment in the following circumstances:

> "... if the Foundation learns of circumstances which the Foundation reasonably believes substantially and adversely affect the Member's ability to fulfill the duties hereunder ..."

For three years Hamilton suffered from a disease which palpably affected his mental faculties. He committed serious medical errors, made a gross misdiagnosis resulting in an unnecessary mastectomy and subjected this patient to high levels of needless radiation therapy. It is undisputed that Hamilton himself told Sullivan that he did not regard himself as being cured. Although plaintiff asserts that he received medical clearance from expert medical personnel, he has presented no evidence to support the claim that he was capable of returning to work.[4]

---

**3.** In the absence of an executed writing, contracts arise by implication for set time periods based upon the behavior of the parties. *Boothby v. Texon, Inc.*, 414 Mass. 468, 608 N.E.2d 1028 (1993). It was the custom and policy of BMERF members to sign consecutive member contracts if the member was evaluated satisfactorily in the previous contract period. Plaintiff received a performance evaluation in December 1988 which raised his salary by 3%, and which took effect January 1, 1989. There is no reason to believe that a contract did not exist.

**4.** It was not unreasonable that defendants did not contact the treating physician prior to their decision to terminate Hamilton.

All evidence before the court confirms the reasonableness of defendants' belief that Hamilton could not fulfill his obligations under the terms of the employment agreement. Whether plaintiff could have properly performed his obligations does not matter. Based on the undisputed facts, defendants' *belief* that Hamilton's illness substantially and adversely affected his ability to fulfill his obligations was certainly reasonable.

A similar conclusion would be reached applying Massachusetts common law. The courts have established that an employee "with a contract for a term certain may only be terminated prior to the expiration of that term for justifiable cause." *Goldhor v. Hampshire College*, 25 Mass.App. 716, 722, 521 N.E.2d 1381 (1988), citing *Mahoney v. Hildreth & Rogers Co.*, 332 Mass. 496, 499, 125 N.E.2d 788 (1955). Absent contractual definition in the context of the contract, "just cause" means an employer can discharge an employee if

> [T]here existed (1) a reasonable basis for employer dissatisfaction with a[n] ... employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other culpable or inappropriate behavior, or (2) grounds for discharge *reasonably related, in the employer's honest judgment, to the needs of his business.*

*Goldhor*, 25 Mass.App. at 723, 521 N.E.2d 1381 (emphasis included).

The court in *Goldhor* stated " 'just cause' must necessarily leave some scope for the exercise of subjective judgment on the part of the employer." *Goldhor* at 722, 521 N.E.2d 1381. As previously explained, in defendants' honest judgment, they had a reasonable basis to terminate Hamilton. Under either the terms of the express BMERF agreements or under the definition of "just cause" set out in *Goldhor*, the undisputed facts establish that plaintiff has not put forth sufficient evidence to challenge the reason-

ableness of defendants' decision to terminate him. *See Id.* at 723, 521 N.E.2d 1381.

### 2. *Pre–Termination Procedural Requirements*

█ Plaintiff argues that his termination violated procedural requirements of the Medical Staff Bylaws ("Bylaws") and the Medical Staff Credentialing Procedure Manual ("Manual").[5] However, it is clear that the procedural requirements set forth therein apply to the suspension of medical staff privileges at Baystate and not to employment disputes. They do not address the employment relationship between the physician and BMERF, and for that reason they do not establish procedural rights for a physician if he or she is terminated by BMERF.

Suspending a practitioner's medical staff privileges at Baystate is distinct from termination of a BMERF employment relationship and requires different procedures. The suspension of a physician's staff privileges at Baystate would impact on that physician's ability to practice medicine anywhere. Therefore, certain procedural rights are afforded to physicians in case their privileges are suspended. Hamilton's medical staff privileges were not suspended. Thus, the procedural requirements were not triggered. In fact, it is possible for a physician to retain his or her medical privileges at Baystate after termination of his or her employment with BMERF. After examining the plain language of the Bylaws and Manual, it is clear that plaintiff was not entitled to their procedural requirements.

### B. *Intentional and Negligent Infliction of Emotional Distress: Counts IV and V*

█ Plaintiff's claims of negligent and intentional infliction of emotional distress cannot survive summary judgment for two reasons. First, the claims are precluded by the exclusivity provision of the Massachusetts worker's compensation statute. Second,

---

**5.** Plaintiff claims that BMERF bylaws impose a requirement upon the Member and Foundation to be bound by all Baystate medical staff review procedures, bylaws, rules and regulations. These include a requirement that the Chairman of a department send a written report to the Clinical Care Evaluation Committee and Medical Quality Assessment Committee if a practitioner's performance shows a pattern that could affect patients' care, that the practitioner must be given notice of the proposed action, and that the practitioner is entitled to a hearing on the matter.

plaintiff has failed to set forth facts sufficient to meet the standards required for the torts of negligent or intentional infliction of emotional distress.

■ The workers' compensation statute, Mass.Gen.L. ch. 152, § 24 provides that an employee waives his right of action at common law with respect to "an injury that is compensable under this chapter, to recover damages for personal injuries, if he shall not have given his employer ... written notice that he claimed such right." Common law actions are thus barred where the plaintiff is shown to be an employee, his condition is shown to be a "personal injury" within the meaning of the Workers' Compensation Act and the injury is shown to have arisen "out of and in the course of employment." *Foley v. Polaroid Corporation,* 381 Mass. 545, 413 N.E.2d 711 (1980). Plaintiff does not allege that he notified his employer of his intention to retain his common law rights. Thus, plaintiff has waived these rights with respect to any injuries compensable under the worker's compensation statute.

■ Injuries arising out of intentional torts committed in the course of an employment relationship must be brought under the administrative scheme set forth in the worker's compensation statute. *Tennaro v. Ryder Sys.,* 832 F.Supp. 494, 499 (D.Mass.1993); *Mullen v. Ludlow Hosp. Soc.,* 32 Mass.App. Ct. 968, 970–971, 592 N.E.2d 1342 (1992). Mass.Gen.L. ch. 152, § 1(7A), states that "mental or emotional difficulties" fall within the compensation scheme if "an event or series of events occurring within the employment" is "a significant contributing cause to such disability." Any emotional injury suffered is compensable solely under the worker's compensation statute. Common law actions based on such an injury are barred by the exclusivity provision of this statute. *See* Mass.Gen.L. ch. 152, § 15 (co-employees); *Mendes v. Tin Kee NG.,* 400 Mass. 131, 132, 507 N.E.2d 1048 (1987); Mass.Gen.L. ch. 152, § 23 (employers).

■ The exclusivity bar applies even where the allegedly injurious actions occur in the course of termination. *Bertrand v. Quincy Market Cold Storage & Warehouse Company,* 728 F.2d 568 (1st Cir.1984).[6] In *Bertrand,* the court held that as "the employer's conduct substantially took place while the plaintiff was an employee, and it explicitly concerned his employment, the plaintiff suffered 'a personal injury arising out of and in the course of his employment.'" *Id.* at 572, citing Mass.Gen.L. ch. 152, § 26. It is undisputed that all actions complained of in this case occurred in connection with the drawn out termination process. Plaintiff's claim that his emotional distress was caused by uncertainty in his official employment status clearly arises out of the nature of his employment.

■ Moreover, in order to prevail under a common law theory of intentional infliction of emotional distress plaintiff must show that the conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community. *Agis v. Howard Johnson Company,* 371 Mass. 140, 145, 355 N.E.2d 315 (1976). As a matter of law, the contact alleged certainly does not rise to the required level of outrageousness. *See Richey v. American Automobile Association,* 380 Mass. 835, 406 N.E.2d 675 (1980) (holding that the conduct of plaintiff's supervisor in terminating the plaintiff after attempting to verify plaintiff's excessive absences did not make out a plausible case of outrage); *Mathias v. Beatrice Foods Co.,* 23 Mass.App. 915, 500 N.E.2d 812 (1986) (holding that where the complaint alleged that the employer gave the plaintiff a poor performance review, increased his sales goals by 42% and pressured him to take early retirement, the conduct was not extreme and outrageous).

■ Claims of *negligent* infliction of emotional distress are also barred by the exclusivity provisions of the Workers' Compensation Act. Mass.Gen.L. ch. 152, § 24, as in

---

6. In *Bertrand,* the court held that even though a letter to a former employee may have been sent after the employment relationship ended, it was a part of a single course of conduct begun by a previous letter directing the employee to return to work or submit evidence of his inability to do so, while the plaintiff was still an employee. His claim for intentional infliction of emotional distress was barred by the exclusive remedy provision of the worker's compensation law.

effect prior to St.1991, ch. 398, § 43. *Catalano v. First Essex Savings Bank,* 37 Mass. App. 377, 639 N.E.2d 1113 (1994). In prior years, there was confusion in Massachusetts as to whether the Worker's Compensation Act barred claims for negligent infliction of emotional distress; *see Maguire v. Boston Rent Equity Bd.,* 25 Mass.App. 951, 518 N.E.2d 882 (1988).[7] This confusion was ended by *Catalano.*

■ Furthermore, Hamilton has not set forth evidence of "physical harm manifested by objective symptomology," which is necessary to bring a claim of negligent infliction of emotional distress. *Mullen,* 32 Mass.App.Ct. at 971, 592 N.E.2d 1342, quoting *Payton v. Abott Labs.,* 386 Mass. 540, 557, 437 N.E.2d 171 (1982). In his answers to interrogatories, plaintiff stated that he suffered from insomnia, frequent headaches and gastric distress. Plaintiff sought no treatment for these conditions and incurred no expenses. The SJC has held that complaints of sick stomach, sleeplessness and sweating do not constitute evidence of the requisite harm. *Payton,* 386 Mass. at 557, 437 N.E.2d 171. Thus, Hamilton is unable to prove the physical harm that is required, and defendants are entitled to summary judgment as a matter of law.

### C. *Loss of Consortium: Count VI*

■ Plaintiff's wife, Charlene Hamilton, has brought a loss of consortium claim against defendants. The exclusive remedy section of the Workers' Compensation Act explicitly precludes common law actions brought by other parties for the loss of the injured worker's "consortium, parental guidance, companionship or the like." Mass. Gen.L. ch. 152, § 24, as amended St.1986, ch. 662, § 18; *St. Germaine v. Pendergast,* 411 Mass. 615, 624–625, 584 N.E.2d 611 (1992). Charlene Hamilton cannot maintain a loss of

spousal consortium claim deriving from injuries compensable under Mass.Gen.L. ch. 152. Mass.Gen.L. ch. 152, § 24; *St. Germaine,* 411 Mass. at 624–625, 584 N.E.2d 611.

Moreover, since summary judgment will be granted on the negligent and intentional infliction of emotional distress claims (Counts IV and V), Charlene Hamilton's claim must also fail because it is based on the same factual allegations. Any recovery by a wife for loss of consortium would require proof of a tortious act that caused injury to her husband. Thus, because Dr. Hamilton is unable to survive a motion for summary judgment on his intentional and negligent infliction of emotional distress claims, defendants are also entitled to summary judgment on Mrs. Hamilton's claim for loss of consortium. Defendants' motion to dismiss the loss of consortium claim will be allowed.

### V. *CONCLUSION*

For the foregoing reasons this court hereby ALLOWS defendants' motion for summary judgment.

---

**7.** The confusion arose in the interpretation of the 1986 Amendment to this statute, which provided that if the emotional disability arose out of a bona fide personnel action, it was not compensable unless it was the result of intentional infliction of emotional distress. In the amendment, the legislature did not expressly mention claims for negligent infliction of emotional distress. However, the court stated that "[i]n those circumstances, it seems unlikely that the Legislature intended to preserve a civil action for claims based on negligent infliction of emotional distress.... To do so would negate ... the intended purpose of the Worker's Compensation Act to provide a uniform, statutory remedy for injured workers," in contrast to a piecemeal, tort-based system."