USCA1 Opinion

 

 September 20, 1995 [NOT FOR PUBLICATION] U.S. COURT OF APPEALS FOR FOR THE FIRST CIRCUIT ____________________ No. 94-2211 WILLIAM HAMILTON AND CHARLENE HAMILTON, Plaintiffs, Appellants, v. BAYSTATE MEDICAL EDUCATION, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Michael Ponsor, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Campbell, Senior Circuit Judge,  ____________________ and Cyr, Circuit Judge. _____________ ____________________ Wendy Sibbison for appellants. ______________ Toby G. Hartt, with whom Jay M. Presser and Skoler, Abbott & ______________ _______________ _________________ Presser, P.C. were on brief for appellees. _____________ ____________________ ____________________ CAMPBELL, Senior Circuit Judge. This appeal arises ____________________ from the termination of employment of Dr. William Hamilton, a pathologist at Baystate Medical Center ("Baystate") in Springfield, Massachusetts. Dr. Hamilton brought a diversity action in the district court against Baystate, Baystate Medical Education and Research Foundation ("BMERF"), and Baystate Health Systems ("BHS"), alleging breach of contract, negligent infliction of emotional distress, and intentional infliction of emotional distress.1 In addition, Dr. Hamilton's wife, Charlene Hamilton, sued for loss of consortium. The district court granted Defendants' motion for summary judgment on all counts. Hamilton v. Baystate ________ ________ Medical Educ. & Research Found., 866 F. Supp. 51 (D. Mass. ________________________________ 1994). We affirm. I. I. Dr. Hamilton worked as a pathologist at Baystate from 1970 to 1989. In 1986, BHS created BMERF, a corporation which employs doctors to work at Baystate.2 At that time, Dr. Hamilton, along with all full-time pathologists at Baystate, entered into a series of annual BMERF employment contracts.   ____________________ 1. We note Plaintiffs' statement that "no claim of handicap discrimination was brought." 2BHS is the parent corporation of both Baystate (a hospital) and BMERF. -2- 2 In 1986, Dr. Hamilton's performance as a pathologist began to deteriorate. Over the next two and a half years, his performance became progressively worse, and he made a number of errors in diagnoses and the labeling of specimens. In early 1989, Dr. John Sullivan, Chairperson of the Baystate Pathology Department, learned that Dr. Hamilton had made an egregious error in November of 1988. Dr. Hamilton had incorrectly diagnosed breast cancer, resulting in a patient receiving unnecessary surgery, a potentially carcinogenic dose of radiation therapy, and a toxic course of chemotherapy. On January 19, 1989, Dr. Sullivan met with Dr. Hamilton and suggested that Dr. Hamilton resign. At that meeting, it was agreed that Dr. Hamilton would take some vacation time to determine whether he was ill. Dr. Hamilton soon learned that he had been suffering from Graves Disease for roughly the previous three years. Graves Disease is a severe disease of the thyroid gland which, if untreated, results in the impairment of a person's memory and ability to concentrate. Dr. Hamilton's treating physician, Dr. Haag, Chief of the Endocrine/Metabolic Division at Baystate, characterized Dr. Hamilton's condition as severe. He suggested that it was probably responsible for Dr. Hamilton's poor performance. Dr. Hamilton took approximately five months of sick leave and paid vacation. -3- 3 By the summer of 1989, Dr. Hamilton's thyroid gland was functioning normally, but he continued to experience episodes of cardiac arrhythmias. In August, Dr. Hamilton wrote to Dr. Sullivan stating that although he was not in a position to make long-term decisions and he did not think he was completely cured, he wanted to return to work on a part- time basis in September. In early September, Dr. Hamilton twice reiterated his desire to return to Baystate, but each time his request was denied. Shortly thereafter, Dr. Hamilton retained an attorney to negotiate a severance agreement with Defendants. In January 1990, a medical malpractice tribunal found Dr. Hamilton negligent in the case of the misdiagnosed breast cancer, and Dr. Sullivan filled out a terminal evaluation form that was back dated to September 1, 1989. In February 1990, settlement negotiations between Dr. Hamilton's attorney and Defendants broke down, and Dr. Hamilton was asked to retrieve his belongings from Baystate.  II. II. Discussion Discussion We review the district court's grant of summary judgment de novo. Goldman v. First National Bank, 985 F.2d _______ ___________________ 1113, 1116 (1st Cir. 1993); Velez-Gomez v. SMA Life Assurance ___________ __________________ Co., 8 F.3d 873, 874 (1st Cir. 1993). Summary judgment will ___ be affirmed only if "no genuine issue of material fact exists -4- 4 and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); O'Connor v. Steeves, 994 F.2d ________ _______ 905, 906-907 (1st Cir. 1993). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Oliver v. ______ Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988) ________________________ (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 ________ ____________________ (1986)). In determining whether a factual dispute exists, all reasonable inferences are made in favor of the nonmoving party, in this case, the Hamiltons. See O'Connor, 994 F.2d ___ ________ at 907. Nevertheless, the Hamiltons must provide evidence of an issue of material fact, and may not rely "merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds ____________ ______________ Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). ___________ A. Breach of Contract A. Breach of Contract Dr. Hamilton had two separate relationships with Defendants: an employee-employer relationship with BMERF3 and a professional staff appointment with Baystate. Dr. Hamilton argues that Defendants (1) violated the BMERF  ____________________ 3The relevant employment contract between Dr. Hamilton and BMERF was between January 1, 1989, and January 31, 1990. Although no signed contract was produced by either of the parties, Defendants do not object, for purposes of this appeal, to the district court's finding that an implied contract existed for the above period with the same terms as the standard 1989 BMERF physician employment contract. -5- 5 employment contract by discharging him without cause and (2) violated the BMERF and Baystate contracts by disregarding pre-termination procedural requirements. We address each of these contentions. 1. Substantive Breach of Contract 1. Substantive Breach of Contract Dr. Hamilton alleges that he was discharged without cause in violation of his BMERF employment contract. Summary judgment was correctly allowed if the evidence, viewed in a light most favorable to Dr. Hamilton, was such that no reasonable juror could find that his termination violated either the express terms of his contract or the common law standard of "just cause." Under either standard, Defendants were justified in terminating Dr. Hamilton if they reasonably believed that he was unable to fulfill the duties of a full- time pathologist at Baystate.4 Based on the record before  ____________________ 4The employment contract provided in relevant part: The Foundation [BMERF] may terminate this Agreement promptly . . . if the Foundation learns of circumstances which the Foundation reasonably believes substantially and adversely affect the Member's ability to fulfill the duties hereunder . . . . The common law standard of "just cause" has been defined by Massachusetts courts to mean: [T]here existed (1) a reasonable basis for employer dissatisfaction with a[n] . . . employee, entertained in good faith, for reasons such as lack of capacity or diligence, failure to conform to usual standards of conduct, or other -6- 6 the district court, we affirm the district court's grant of summary judgment. Dr. Hamilton correctly states that, in order to satisfy the terms of his employment contract, Defendants must have had a current belief at the time of termination that Dr. Hamilton was unable to perform his duties. All the admissible evidence here points to such a belief: there is little or nothing to the contrary. Dr. Hamilton had suffered from untreated Graves Disease for approximately three years. This illness most affected his brain, causing him to make repeated, serious mistakes. Dr. Hamilton submitted no evidence directly from his treating physicians that he was fit to return to work in September of 1989. He tendered, instead, only his own hearsay statements that his treating physician said he was cured of Graves Disease,5 statements  ____________________ culpable or inappropriate behavior, or (2) grounds for discharge reasonably related, in the employer's honest judgement, to the needs of his business. (emphasis omitted).  Goldhor v. Hampshire College, 25 Mass. App. Ct. 716, 521 _______ _________________ N.E.2d 1381, 1385 (1988) (quoting Klein v. President & _____ ____________ Fellows of Harvard College, 25 Mass. App. Ct. 204, 517 N.E.2d __________________________ 167, 169 (1987)). 5Dr. Hamilton alleges that his statements are persuasive evidence that he was capable of returning to work. Although a party with the requisite degree of expertise may sometimes offer opinion evidence on his own behalf, see Shane v. ___ ________ Shane, 891 F.2d 976, 982 (1st Cir. 1989); Von Henneberg v. _____ _____________ Generazio, 403 Mass. 519, 531 N.E.2d 563, 566 (1988); Foley _________ _____ v. Foley, 27 Mass. App. Ct. 221, 537 N.E.2d 158, 160 n.4, _____ review denied, 405 Mass. 1202, 541 N.E.2d 344 (1989), we need _____________ -7- 7 which must be read in conjunction with his treating physician's deposition statement that, in his opinion, as of September 1, 1989, he did not know whether Dr. Hamilton's cognitive function had returned to normal, that he was very concerned by the slowness of his recovery, and that Dr. Hamilton "was not able to return to a full-time post, doing everything that a general pathologist had to do to perform all of his duties." Moreover, given the debilitating effects of Graves Disease, it could reasonably be surmised that Dr. Hamilton was unlikely to have kept abreast of the medical knowledge within his field during the period of his illness. We see no basis in this record for concluding anything but that Defendants' discharge of Dr. Hamilton was prompted by their reasonable belief that his condition "substantially and adversely" affected his ability to perform as a pathologist at Baystate in September of 1989. Dr. Hamilton cautions against the granting of summary judgment when "state of mind" is a critical issue. See Stepanischen v. Merchants Despatch Transp. Corp., 722 ___ ____________ __________________________________ F.2d 922, 928-29 (1st Cir. 1983). However, the fact that  ____________________ not decide whether a physician can provide medical evidence as his own expert witness because Dr. Hamilton was not an expert in endocrinology nor did he base his statements on his own medical opinion but rather on the purported opinions of his treating physicians. Dr. Hamilton's hearsay representation of these opinions was not competent evidence within Fed. R. Civ. P. 56(e). See Garside v. Osco Drug, ___ _______ __________ Inc., 895 F.2d 46, 50 (1st Cir. 1990). ____ -8- 8 "state of mind" or motivation is an element of proof does not necessarily preclude summary judgment in an otherwise appropriate case. Id. Accord White v. Hearst Corp., 669 ___ ______ _____ ____________ F.2d 14, 17 (1st Cir. 1982); Hahn v. Sargent, 523 F.2d 461, ____ _______ 468 (1st Cir. 1975), cert. denied, 425 U.S. 904 (1976).  ____________ Dr. Hamilton argues that there is a triable issue as to whether Defendants were honest in their asserted belief that he was unable to perform his duties at Baystate. Under Massachusetts law, an employer's reasons for termination cannot be given in bad faith. See Klein v. President & ___ _____ ____________ Fellows of Harvard College, 25 Mass. App. Ct. 204, 517 N.E.2d __________________________ 167, 169-170 (1987). Defendants should have known, plaintiff argues, that his thyroid gland was functioning normally as of September 1989. But, as pointed out above, Dr. Hamilton presented no objective medical evidence that he was fully fit to perform his duties then and, indeed, did not even himself claim that he was cured. Dr. Hamilton urges that Defendants' failure to report him to the Massachusetts Board of Registration in Medicine as an "impaired physician," and their failure to warn other hospitals where he was working in December of 1989, shows that they did not honestly believe that he was unfit to return to work, and, therefore, that they terminated him in bad faith. We think these omissions were insufficient, by themselves, to establish bad faith. While believing that Dr. Hamilton was unfit to return to work -9- 9 at Baystate, Defendants may, at the same time, have not wanted to destroy his medical career by reporting him to other hospitals and to the Registration Board. Dr. Hamilton argues that Defendants were not reasonable in believing that he was unable to perform his duties at Baystate. He points to their failure to consult his physicians in September of 1989 in order further to ascertain his medical condition. Given, however, the seriousness of Dr. Hamilton's prior mistakes, his hiatus from practicing medicine, his own admission that he was not fully "cured," and his own failure to have presented supporting letters or the like from his physicians attesting to his fitness to practice, we do not think that more was required. Dr. Hamilton further argues that a jury could find Defendants' belief was not reasonable because he was current in his continuing medical education credits. Yet, notwithstanding such credits, Defendants could reasonably surmise that his medical knowledge could not have progressed at the normal rate during the three years he suffered acutely from Graves Disease. 2. Violation of Procedural Safeguards 2. Violation of Procedural Safeguards Dr. Hamilton argues that Defendants violated relevant procedural safeguards by not affording him notice or a hearing. It is undisputed that certain procedures must be followed upon suspension of medical staff privileges or any -10- 10 other specified "adverse action" at Baystate.6 An "adverse action," as defined in Baystate's Fair Hearing Plan, includes: revocation of medical staff membership, reduction in staff category,7 special limitation of the right to admit patients, or reduction of clinical privileges. Dr. Hamilton argues that he suffered a suspension of staff privileges and a reduction in clinical privileges. Defendants respond that they did not suspend Dr. Hamilton's staff privileges at Baystate. They point to the affidavit of Michael Kujath, Executive Director of BMERF, which stated that Dr. Hamilton's "medical staff membership and clinical  ____________________ 6The procedural protections set forth in the Medical Staff Bylaws, the Medical Staff Credentialing Procedure Manual, and the Fair Hearing Plan include: (1) review of suspension within 72 hours by a Medical Staff Summary Suspension Review Committee, (2) written notice to the doctor of the suspension or "adverse action," and (3) a hearing. 7Dr. Hamilton argues that he suffered a reduction in staff category because he lost his appointment as Co-Director of Microbiology at Baystate. Defendants respond in two ways. First, they point to Baystate's Fair Hearing Plan which states that "the removal of a practitioner from a medico- administrative office within the Medical Center" does not entitle the practitioner to a hearing. Second, they argue that the reduction in staff category argument is waived because Dr. Hamilton failed to raise it in the district court. Defendants were given no opportunity to present evidence as to the meaning of "reduction in staff category" and "medico-administrative office." We hold that Dr. Hamilton has waived this line of argument. See Playboy ___ _______ Enters., Inc., v. Public Serv. Comm. of Puerto Rico, 906 F.2d _____________ _________________________________ 25, 40 (1st Cir.), cert. denied, Rivera Cruz v. Playboy ____________ ____________ _______ Enters., Inc., 498 U.S. 959 (1990) ("Issues not raised before _____________ the trial court are waived on appeal . . . absent unusual circumstances or plain error suggesting that a 'clear miscarriage of justice' has occurred.") -11- 11 privileges at Baystate Medical Center, were not, in fact, ever suspended." Suspension of staff privileges would affect Dr. Hamilton's ability to practice medicine not only at Baystate, but at any facility. Dr. Hamilton relies on Defendants' statement of intent to "remove him from the staff" made at the January 1989 meeting where Dr. Sullivan and Dr. Hamilton discussed what should be done about Dr. Hamilton's slipping performance. But the outcome of that meeting was a decision that Dr. Hamilton should take some vacation time to determine if he was ill and that nothing would be done with respect to Dr. Hamilton's employment status at that time.  Dr. Hamilton also relies on the fact that his name was omitted from a list of pathology department members in the House Staff Recruitment Brochure. However, given that this omission was made at a time when Dr. Hamilton was on medical leave, and given Executive Director Kujath's affidavit that Dr. Hamilton was not removed from the staff, we find the omission of Dr. Hamilton's name from the recruitment brochure insufficient, by itself, to create a triable issue as to whether Dr. Hamilton's medical privileges were reduced or suspended. There is no probative evidence in the record that Dr. Hamilton's staff privileges were in fact ever suspended. -12- 12 Dr. Hamilton argues that even if his privileges were not formally reduced or suspended, they were constructively suspended as a necessary consequence of his termination because all full-time Baystate pathologists must be BMERF members. However, in St. Louis v. Baystate Medical _________ ________________ Center, Inc., 30 Mass. App. Ct. 393, 568 N.E.2d 1181, 1186 _____________ (1991), the court noted that physicians who no longer could perform services at Baystate could still have staff privileges.8 Termination of BMERF employment does not constructively result in a change in Baystate staff privileges.  Dr. Hamilton also argues that the Baystate procedural safeguards should apply to the termination of his BMERF contract. BMERF's bylaws provide that all its members' "professional activities" shall be subject to and in compliance with the medical staff review procedures, bylaws, rules, and regulations established by the hospital or facility in which Foundation members are practicing. Dr. Hamilton argues that because his professional activities were governed by Baystate's rules, he is entitled to Baystate's procedural protections upon termination from  ____________________ 8The court stated "[The] doctors no longer performed any professional services at Baystate, even though they continued to enjoy clinical privileges there." St. Louis, 568 N.E.2d _________ at 1186. (The St. Louis case involved a different issue than _________ this case since there Baystate proceeded to formally suspend the clinical privileges of the doctors in question.) -13- 13 BMERF. This argument fails because Baystate's procedural protections expressly apply only to "adverse actions," and the exhaustive list of "adverse actions" does not include termination of a physician's contract with BMERF. Hence termination of Dr. Hamilton's BMERF employment contract did not trigger Baystate's hearing process. B. Tort Claims B. Tort Claims Dr. Hamilton alleges that Defendants both negligently and intentionally inflicted emotional distress upon him because of their callous treatment during his termination. Defendants allegedly failed to notify Dr. Hamilton of his termination for several months. As a result, Dr. Hamilton asserts, he suffered emotional distress from the uncertainty of not knowing when, if ever, he would return to his job. The district court held that both the negligent and intentional infliction of emotional distress claims were barred by the Massachusetts Workers' Compensation Act, and, in addition, that Dr. Hamilton had not alleged facts sufficient to make out a claim for either negligent or intentional infliction of emotional distress. Under Massachusetts law, common law actions are barred by the state's workers' compensation act where (1) the Plaintiff is an employee of the Defendant, (2) the condition is a "personal injury," and the injury arises "out of and in the course of . . . employment." Foley v. Polaroid Corp., _____ ______________ -14- 14 381 Mass. 545, 413 N.E.2d 711, 713-714 (1980); Mass. Gen. L. ch. 152, 26.9 "Personal injury" includes "mental or emotional disabilities only where a significant contributing cause of such disability [is] an event or series of events occurring within the employment." Mass. Gen. L. ch. 152, 1 (7A). This bar applies to claims of intentional infliction of emotional distress, see Tennaro v. Ryder System, Inc., 832 ___ _______ __________________ F. Supp. 494, 500 (D. Mass. 1993); Anzalone v. Massachusetts ________ _____________ Bay Transp. Auth., 403 Mass. 119, 526 N.E.2d 246, 249 (1988); _________________ Mullen v. Ludlow Hosp. Soc'y, 32 Mass. App. Ct. 968, 592 ______ ___________________ N.E.2d 1342, 1345, review denied, 413 Mass. 1103, 598 N.E.2d _____________ 1133 (1992), and claims of negligent infliction of emotional distress, see Clarke v. Kentucky Fried Chicken of California, ___ ______ _____________________________________ Inc., 57 F.3d 21, 27-29 (1st Cir. 1995); Catalano v. First ____ ________ _____ Essex Savings Bank, 37 Mass. App. Ct. 377, 639 N.E.2d 1113, __________________ 1115-16, review denied, 419 Mass. 1101, 644 N.E.2d 225 ______________ (1994).  Dr. Hamilton argues that the Workers' Compensation Act is not applicable because he was no longer an employee at the time Defendants caused his injuries. However, under Massachusetts law, injuries that arise out of the termination process are considered to have arisen "in the course of  ____________________ 9There is an exception to preemption if the employee expressly reserves his right to bring common law causes of action. Mass. Gen. L. c. 152, 24. However, Dr. Hamilton does not assert that he reserved his right to sue outside the Workers' Compensation Act. -15- 15 employment" for purposes of the Workers' Compensation Act. See Bertrand v. Quincy Mkt. Cold Storage & Warehouse Co., ___ ________ __________________________________________ 728 F.2d 568, 572 (1st Cir. 1984) (holding that injuries caused in part by a letter that may have been sent to plaintiff after termination were nonetheless barred by Workers' Compensation Act because it was part of a single course of conduct begun when plaintiff was still an employee); Presto v. Sequoia Sys., Inc., 633 F. Supp. 1117, ______ ___________________ 1120-21 (D. Mass. 1986); Flynn v. New England Tel. Co., 615 _____ _____________________ F. Supp. 1205, 1209-10 (D. Mass. 1985) (holding that a claim for emotional injury arising out of termination process was barred by Workers' Compensation Act). The conduct that allegedly injured Dr. Hamilton was part of a series of actions that resulted in his termination. We conclude that Dr. Hamilton's personal injury claims against his employer were barred by the Workers' Compensation Act. After deciding that the emotional distress claims were statutorily barred, the district court went on to find, in addition, that Dr. Hamilton had failed to set forth facts sufficient to make out a claim of negligent or intentional infliction of emotional distress. The court was also correct in this determination. The Supreme Judicial Court of Massachusetts has held that the negligent infliction of emotional distress requires physical harm "manifested by objective -16- 16 symptomatology." Payton v. Abbott Labs, 386 Mass. 540, 437 ______ ___________ N.E.2d 171, 181 (1982). There must be "objective corroboration of the emotional distress alleged." Sullivan v. ________ Boston Gas Co., 414 Mass. 129, 605 N.E.2d 805, 809 (1993) ______________ (quoting Payton, 437 N.E.2d at 175). Dr. Hamilton alleges ______ that he suffered severe stomach pains, frequent headaches, and insomnia as a result of Defendants' actions.  Dr. Hamilton argues that under Massachusetts law his symptoms suffice to sustain a claim for negligent infliction of emotional distress. Sullivan, 605 N.E.2d at ________ 806-07, 810-11. The Sullivan court found that plaintiffs' ________ showing satisfied the physical harm requirement of a claim of negligent infliction of emotional distress. In that case, one plaintiff suffered from tension headaches, muscle tenderness, insomnia, gastrointestinal distress, upset stomach, nightmares, depression, despair, difficulty in driving and working, and concentration and reading problems. The second plaintiff suffered from severe physical symptoms associated with clinical post traumatic stress disorder including diarrhea, heart palpitations, insomnia, depression and despair. Both plaintiffs provided expert medical evidence of their physical harm. Id. Dr. Hamilton's alleged ___ symptoms were less severe than those in Sullivan, were not ________ treated, resulted in no related expenses, and were -17- 17 corroborated by no medical testimony. The Sullivan court ________ stated that plaintiffs must corroborate their mental distress claims with enough objective evidence of harm to convince a judge that their claims present a sufficient likelihood of genuineness to go to trial. Expert medical testimony may be needed to make this showing . . . . The judge will consider each case in its particular factual context . . . . [T]he judge will use his or her discretion to evaluate the evidence. Id. at 810. The record here supports the district court's ___ conclusion that Dr. Hamilton "is unable to prove the physical harm that is required." Hamilton, 866 F. Supp. at 57. ________ The district court also ruled that Dr. Hamilton had not set forth facts sufficient to meet the requirements of a claim of intentional infliction of emotional distress. The standard for this cause of action is "extreme and outrageous" conduct, "beyond all possible bounds of decency" and "utterly intolerable in a civilized community." Redgrave v. Boston ________ ______ Symphony Orchestra, Inc., 557 F. Supp. 230, 236 (D. Mass. _________________________ 1983); Foley v. Polaroid Corp., 400 Mass. 82, 508 N.E.2d 72, _____ ______________ 82 (1987); Agis v. Howard Johnson Co., 371 Mass. 140, 355 ____ ___________________ N.E.2d 315, 318-19 (1976). We agree with the district court that none of the Defendants' actions, viewed in a light favorable to Dr. Hamilton, rises to this level. Dr. Hamilton argues that Defendants mislead him into believing that he might be able to return to work and -18- 18 withheld notice of his termination for a period of several months. Whatever Defendants' motivation, the actions alleged were not extreme, outrageous or intolerable. We see no evidence of behavior sufficient to sustain a claim for intentional infliction of emotional distress. C. Loss of Consortium C. Loss of Consortium Mrs. Hamilton appeals from the grant of summary judgment for Defendants on her loss of consortium claim. Mrs. Hamilton's claim fails for two reasons. First, spousal loss of consortium claims based on injuries compensable under the Workers' Compensation Act are specifically barred. Mass. Gen. L. ch. 152, 24. Second, Mrs. Hamilton's claim fails because summary judgment was appropriately granted against the underlying tort claims of emotional distress. Any recovery for loss of spousal consortium requires proof of a tortious act causing injury to the spouse. See Mouradian v. ___ _________ General Electric Co., 23 Mass. App. Ct. 538, 503 N.E.2d 1318, ____________________ 1321, review denied, 399 Mass. 1105, 507 N.E.2d 1056 (1987).  _____________ Affirmed. Affirmed ________ -19- 19